IMPORT WHOLESALERS COR-
PORATION

v.

The **UNITED STATES.**

No. 111–63.

United States Court of Claims.

Nov. 10, 1966.

Edmund Purves, New York City, for plaintiff. George D. Webster, Washington, D. C., attorney of record.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, JONES, Senior Judge, and DURFEE, DAVIS and COLLINS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on August 16, 1965. Plaintiff requested the court to adopt the trial commissioner's findings of fact with certain additions and excepted to his recommendation for conclusions of law. Defendant requested that the court adopt both the findings of fact and the recommended conclusions of law. The case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the trial commissioner's findings, opinion and recommendation for conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER*

HOGENSON, Commissioner:

■■ This is a suit for refund of excise taxes alleged to have been erroneously assessed against and collected from plaintiff, a Florida corporation formerly engaged in the business of selling Volkswagen automobiles at retail. The statute under which the pertinent tax is imposed, 26 U.S.C. (I.R.C.1954) § 4061 (1958 Ed.),[1] places a tax (called a manufacturers excise tax) not on the act of importation, but on the first sale in the United States of an automobile imported from abroad. Indian Motocycle Co. v. United States, 283 U.S. 570, 574, 51 S.Ct. 601, 75 L.Ed. 1277 (1931). Thus, whether plaintiff was the "importer" liable for the excise tax on the Volkswagen automobiles involved in this case is to be determined by resolution of the issue as to whether plaintiff under the statute was the first purchaser in the United States of such imported automobiles. Handley Motor Co. v. United States, 338 F.2d 361, 364, 168 Ct.Cl. 92, 98 (1964).

### CLAIM FOR REFUND

However, it would seem that the court should first decide the threshold question as to whether it has jurisdiction to entertain this case on the merits in view of defendant's challenge that plaintiff never filed a claim for refund as required by statute, 26 U.S.C. (I.R.C.1954) § 7422 (1958 Ed.)[2]

On January 27, 1960, the District Director of Internal Revenue, Jacksonville,

---

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. § 4061. Imposition of tax.
   (a) *Automobiles.* There is hereby imposed upon the following articles (including in each case parts or accessories therefor sold on or in connection therewith or with the sale thereof) sold by the manufacturer, producer, or importer a tax equivalent to the specified percent of the price for which so sold:

   *       *       *       *       *

   (2) Articles taxable at 10 percent except that on and after July 1, 1959, the rate shall be 7 percent—
   Automobile chassis and bodies other than those taxable under paragraph (1).
   Chassis and bodies for trailers and semitrailers (other than house trailers)

suitable for use in connection with passenger automobiles.
A sale of an automobile, trailer or semitrailer shall, for the purposes of this paragraph, be considered to be a sale of the chassis and of the body.

2. § 7422. *Civil actions for refund.*
   (a) *No suit prior to filing claim for refund.*
   No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, *according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.*

Florida, seized certain of plaintiff's automobiles at its lot in Miami, Florida, after having made and issued a jeopardy assessment against plaintiff for excise taxes due on its sales of imported automobiles in the fourth quarter of 1959. The jeopardy assessment was in the sum of $62,100, and the value of the seized automobiles is allegedly $12,291.86.[3]

The jeopardy assessment and seizure of the automobiles were protested by plaintiff by filing Internal Revenue Service Form 843 with the District Director on February 10, 1960. The form as executed, recites that the claim pertains to a jeopardy assessment in the amount of $62,100 for manufacturers excise taxes for the period from October 1, 1959, through December 31, 1959. The claim form states that no payment for the tax had been made, that there was no amount to be refunded, but the amount to be abated was $62,100. Form 843 is and was the same form used for refund of taxes paid, for refund of amounts paid for revenue stamps, and for abatement of taxes assessed but not paid.

Attached to the Form 843 claim filed by plaintiff were several documents made part of the claim by reference language on the claim form. Among the attachments are (1) a sworn statement of plaintiff's president, stating the same grounds for abatement of the tax as are urged by plaintiff for refund of tax in this case, and (2) a letter from plaintiff's attorney, stating in pertinent part:

> I respectfully urge that in order to mitigate the damages that we have already been caused to suffer (which I must inform you that I shall hold your Department personally liable for) by what we have urged upon you is an unjust and illegal tax lien and Jeopardy Assessment, that you immediate-

ly release the lien and assessment and return to us our rightful property.

In April and May 1960, the Internal Revenue Service sold plaintiff's automobiles which had been seized following the jeopardy assessment. Proceeds from this sale amounted to about $9,243.88, no part of which has been refunded or made available to plaintiff. No further claim or amendment to the February 10, 1960, claim was filed by plaintiff.

The District Director disallowed plaintiff's claim in full by form letter, dated April 20, 1961. This letter states that it is in reply to a "claim for refund" of manufacturers excise taxes in the amount of $62,100 for the period ending December 31, 1959.

In Ertle v. United States, 93 F.Supp. 619, 118 Ct.Cl. 57 (1950),[4] this court considered a predecessor statute like the claim for refund statute involved in this case, and ruled that the court lacked jurisdiction to entertain a suit by taxpayers to recover sums of money paid as statutory penalty assessments for willful nonpayment of excise taxes. In that case, taxpayers had filed claims for abatement of the penalty assessments with the Collector of Internal Revenue; such claims were denied prior to payment; taxpayers then paid the penalties under protest, as stated on the receipt issued to them; but after payment, no claim for refund was filed. This court declined to construe either the protest or the claim for abatement as being a compliance with the claim for refund statute.

However, this case is distinguishable from the *Ertle* case in that plaintiff herein in its claim for abatement set forth the necessary elements for refund, and the claim was so treated by defendant. Plaintiff asserted "some form of request for refund" which "made avail-

---

3. At the pretrial conference, the parties agreed that the trial of this case be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings. The agreement was approved by the trial commissioner.

4. This case was not cited by the parties, and no other case has been found or cited by the parties, in which there has been a ruling that a claim for abatement was or was not under any circumstances sufficient to satisfy the requirements of the claim for refund statute.

able sufficient information as to the tax and year to enable the Internal Revenue Service to commence, if it wishes, an examination into the claim." American Radiator & Standard Sanitary Corp. v. United States, 318 F.2d 915, 920, 162 Ct.Cl. 106, 114 (1963), and numerous cases therein cited and discussed. Here, the plaintiff's claim requested "return" of its "rightful property" and asserted clearly that it was not the first purchaser in the United States of the imported automobiles, and that it was therefore not liable for the excise taxes assessed on the sale of such automobiles during the last quarter of 1959, the tax period involved in this case. Once the District Director had sold the seized automobiles, it was reasonable for him to treat plaintiff's request for return of the seized automobiles as a claim for refund of the proceeds of the sale. His use of the "claim for refund" form letter to give notice of denial of plaintiff's claim is reasonably understood on this basis. Defendant's contention that such form was used by mistake is not supported by substantial evidence and is contrary to the reasonable inferences to be drawn from the facts and circumstances in evidence.

At the time of the filing of plaintiff's claim on Form 843 with the included attachments, the District Director had plaintiff's automobiles in his possession; plaintiff's claim fully advised the District Director as to the nature of the tax in dispute and the taxable period involved, and requested return of the automobiles, asserting in detail grounds therefor; the automobiles were thereafter sold; and the District Director then reasonably treated plaintiff's claim as a claim for refund. See Continental Illinois Nat. Bank & Trust Co. of Chicago v. United States, 39 F.Supp. 620, 94 Ct. Cl. 126 (1941), and cases therein cited. It is concluded that plaintiff's claim was sufficient to satisfy the requirements of the claim for refund statute, and that the court has jurisdiction of the subject matter of plaintiff's petition.

IMPORTER OF VOLKSWAGENS

Both plaintiff and defendant rely upon the ruling of this court in Handley Motor Co. v. United States, supra, that the first purchaser in the United States of imported Volkswagen automobiles is the "importer" liable for the excise taxes to be paid under section 4061 of the Internal Revenue Code of 1954. Plaintiff basically contends that a New York corporation, Deeren Trading Corporation, not plaintiff, was the first purchaser of the imported Volkswagens involved in this case, and that plaintiff was therefore not liable for the excise taxes on subsequent sales of such automobiles. Defendant contends that Deeren was in reality plaintiff's agent in the importation of the Volkswagens, and that plaintiff was in fact the importer or first purchaser in the United States.

For consideration of the respective contentions of the parties, it is necessary to review in detail the facts and circumstances relating to the formation and operation of both Deeren and plaintiff and the relationship between them on the importation of the pertinent Volkswagens.

In early 1957, Charles Kirkiles met Menas Petrides in New York City at the office of Pelagic Company, Ltd., being introduced by George Stathos, principal stockholder and officer of Pelagic. Kirkiles, a stockholder in Pelagic, was a partner in an accounting firm which had Pelagic as a principal client, and Kirkiles maintained a branch office for his firm, located next to the Pelagic suite.

Petrides, a Greek national, had migrated to California after World War II, and arrived in New York City with limited means. Stathos could offer him no employment, but permitted him to use desk space in the offices of Pelagic, with the understanding that Petrides would try to set up an import business, and Stathos would share in the profits. From 1957 to mid-1959, Petrides had no regular employment, maintained himself on limited savings brought from California, loans from Stathos, fees for translating documents, and other odd

jobs. In mid-1959, he became sole agent and owner of the Deeren Trading Corporation, from which he received neither salary nor dividends. In February 1960, he suddenly left the United States without funds and has been in South America ever since.

In the meantime, Petrides had repeatedly discussed with Kirkiles the business of importation of various goods and articles from South America and Japan, and also the importation of Volkswagen automobiles from Germany. Kirkiles maintained export-import accounts for some of the clients of his accounting firm, and learned to appreciate the possible profits to be realized from importing compact automobiles.

By early 1959, Pelagic had failed and closed its offices, and George Stathos was residing in Germany. Petrides was without office space or even a telephone in his apartment, and used Kirkiles' office as a mailing address and place to receive messages.

In March 1959, Kirkiles went to Hamburg, Germany, where he met a German attorney, Dr. Georg Constant, who expressed his intention to migrate to the United States, and asked Kirkiles about business opportunities there. Among other suggestions, Kirkiles discussed importation of Volkswagens for sale at retail. Constant then introduced Kirkiles to Charles Feit, an American visiting in Germany, who had had considerable experience in the automobile business in the United States.

Discussions between Kirkiles, Constant, and Feit concerning Volkswagen sales in the United States were held for a number of days, including one weekend when they together visited Stathos at a nearby resort where he was recovering from an illness. The three men tentatively decided to avoid any effort to obtain a franchise from an authorized Volkswagen distributor in the United States but to explore the possibilities of establishing a Volkswagen sales business in Miami, Florida, with used Volkswagens supplied in shipments from Germany to a port at or near Miami, Florida.

Since Baltimore, Maryland, was the southernmost port receiving Volkswagen shipments in the United States, they believed that receiving such shipments at Miami would place them in a favored position for sales in the south.

Kirkiles and Feit returned to the United States, and thereafter from April through August 1959, engaged in numerous conferences with officers (including an uncle of Feit) of the Central Bank and Trust Company at Miami, Florida. Their discussions concerned amount of financing Central would provide for the purchase of Volkswagens, method of payment for the automobiles, who would supply the automobiles, Central's finance charges, and how repayment of loans would be made to Central. It was agreed that the three promoters of the proposed business would deposit $50,000 with Central and that the bank would open a $250,000 credit account for the corporation to be formed.

Plaintiff was incorporated as a Florida corporation in August 1959, with the three promoters as its officers and stockholders in respective proportion of shares, as follows:

Feit, president, 25 percent
Kirkiles, vice president, 25 percent
Constant, secretary-treasurer, 50 percent

In the summer of 1959, Kirkiles proposed to Petrides that the latter take over Deeren Trading Corporation, the organization of which had been undertaken by Kirkiles, his brother, and the members of a New York law firm, but concerning which no capital contributions had been made or stock issued. Incorporation of Deeren was completed that summer, with Petrides as the owner and thereafter the sole employee thereof. Deeren's office was in New York City in the same space with that of Emerson Trading Corporation, which had been formed and was solely owned by Stathos. Emerson had remained dormant until June 1959, when Stathos referred Petrides, as the unpaid agent of Emerson, to Hans R. Luer, a German exporter of Volkswagens, and Petrides then used

Emerson as the importer in placing a New York automobile dealer's order with Luer, although the corporate purpose of Emerson was not the importation of automobiles. Kirkiles apparently aided Petrides in arranging this transaction.

Kirkiles' firm was engaged by Deeren as its accountant. Deeren had practically no assets, and its office space was paid for by Emerson.

On August 19, 1959, Deeren, as seller, and plaintiff, as purchaser, entered into a written agreement, whereby plaintiff agreed to purchase from Deeren a minimum of 100 and a maximum of 300 used Volkswagen automobiles per month for a "competitive market price" plus $5 for each automobile. The "competitive market price" is therein defined to include the bank lien, or invoice cost of the automobile, customs duty, freight charges, and customs brokers' fee. The agreement further provides that the $5 per automobile be paid directly to Deeren and that plaintiff pay all other costs and expenses "directly at the request" of Deeren.

The automobiles ordered by Deeren from Luer for plaintiff were shipped to a port of entry in or nearby Miami. From the $250,000 account held by Central for plaintiff's purchase of automobiles, Central forwarded to its correspondent New York bank, which was the assumed agent for Deeren, a letter of credit in an amount sufficient to cover the cost of the automobiles and expenses of shipment. The letter of credit was expressly made irrevocable and assignable, and for each order of automobiles it was assigned and returned to Central in Miami. The purpose of the assignment was to accomplish payment for the shipment of automobiles upon arrival at the port of entry.

In all cases, the exporter forwarded all documents of ownership for the Volkswagens to the New York bank in the name of Deeren as importer and buyer. The indicia of ownership were not released to Deeren, however, but were forwarded to Central, which had banker's liens on the automobiles. Upon arrival of the automobiles, Deeren through its New York bank, which forwarded the German titles to the Volkswagens, directed Central to remit payment to a designated German bank for the automobiles and to the customs broker for his services in connection with clearance. Payments were made by Central from the account derived from the assigned letter of credit, and title was simultaneously transferred to plaintiff. The physical possession of the title documents, however, remained with Central, which held trust receipts on the Volkswagens against the original loan of $250,000. When the automobiles were sold at retail to plaintiff's individual customers, title was transferred to the name of the customer and delivered to him or to his bank, if he chose to finance the purchase. From the individual sales by plaintiff, Central recouped its loan made to plaintiff for the purchase of the automobiles.

All documents in evidence forming part of the process of importation in the United States, agreements to sell, bills of lading, customs invoices, seller's (exporter's) invoices, broker's statements, designate Deeren either as the "importer of record," or the "purchaser," or the "party whose account is to be charged." None of the same documents indicates that plaintiff assumed any risk in the importation of the vehicles into the United States. In any event, the risk was minimal in view of the fact that marine insurance was carried on the shipments while in transit. Although it does not appear in whose name the insurance was carried (Kirkiles called it a "bearer policy" in his testimony), it is inferred from the facts attendant to the agreement between Deeren and plaintiff that the insurance cost was borne by plaintiff.

Deeren imported some Volkswagens and sold them to automobile dealers other than plaintiff, but such dealers must have paid to Deeren much more than $5 per automobile, although there is no evidence as to what arrangements Deeren had with such customers. Petrides had agreed on the profit arrangement be-

tween Deeren and plaintiff on the basis of plaintiff's anticipation that it could handle 200 Volkswagens per month, and on this basis, Deeren would realize a steady income of $1,000 per month, sufficient to pay Deeren's overhead and a salary for Petrides, leaving the latter free to negotiate contracts with other automobile dealers to the profit of Deeren.

Hans Luer was the only German supplier of automobiles with whom Deeren dealt. The record discloses no direct contact between Luer and plaintiff. However, Deeren in no instance placed an order with Luer without a prior commitment for purchase by plaintiff or some other dealer. There was no negotiation for price between Deeren and Luer. Petrides simply placed the American dealer's order with Luer in Deeren's name, and he was subsequently advised of shipment date, Petrides designated Deeren's role in the transaction with Luer as purchaser "on a consignment basis." Until the invoices from Luer were received by the New York bank and forwarded to Central, neither Deeren nor plaintiff knew the cost for the shipment. Plaintiff at that time added up all of the charges on the shipment, divided the total sum by the number of automobiles in the shipment, and thus determined whether or not the price per unit was satisfactory. If such price was within market price limitations, plaintiff then accepted and purchased the shipment.

As each shipment of Volkswagens arrived in or near Miami, clearance was arranged by a customs broker who was paid by Central from plaintiff's account. Plaintiff's employees then took possession of such automobiles and delivered them to plaintiff's lot for sale at retail.

After Central had paid the German bank designated by Luer for payment for the shipment, plaintiff then sent Deeren a check equal to $5 for each automobile received. Invoices purporting to be bills of sale from Deeren to plaintiff are in evidence and indicate the total cost for the shipment, less the price paid to the German bank for the automobiles and less other related costs, such as customs duties, freight, and customs brokers' fees paid by Central at the direction of Deeren from plaintiff's account, and showing the net balance due Deeren. This last item is in every case the $5 per automobile profit to Deeren. Only this amount was actually paid to Deeren. The checks in payment were prepared by Kirkiles, who was accountant for both plaintiff and Deeren, and in some instances Kirkiles endorsed the checks for deposit to Deeren's bank account.

In the *Handley Motor* case, supra, the plaintiff taxpayer was, like plaintiff herein, the retail automobile dealer who received and sold imported Volkswagens. Handley was held to be the importer. There, however, the import documents named Handley as the importer, consignee or recipient, whereas here, plaintiff was not mentioned therein. There, the broker Amerifact was not named in such documents and did not enter into the chain of title, whereas here, the so-called counterpart of Amerifact, Deeren, was named in the import documents as the importer, consignee or recipient. A further distinction relied upon by plaintiff and supported by the evidence herein is that there, Handley had no sales agreement with Amerifact, whereas here, there existed an agreement between Deeren, as seller, and plaintiff automobile dealer, as purchaser, with respect to the imported Volkswagens.

Plaintiff contends that these distinctions require a holding pursuant to *Handley* that plaintiff herein was not the first purchaser of the imported Volkswagens.

However, the essence of the *Handley* ruling seems to be that the determination of who is the "importer" under the pertinent statute does not turn on technical rules such as the law of sales, but rather on the realities as to who arranges as principal and not as agent for the articles to be imported into the United States.

This theme of the *Handley* opinion conforms with a well recognized principle of tax law succinctly stated by the

Supreme Court in Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 358, 84 L.Ed. 406 (1940), as follows:

* * * A taxpayer is free to adopt such organization for his affairs as he may choose * * *

On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property.

In Hooven & Allison Co. v. Evatt, 324 U.S. 652, 661–663, 65 S.Ct. 870, 89 L.Ed. 1252 (1945), involving constitutional immunity of imports from state taxation, the Ohio Supreme Court had ruled that petitioner was subject to a state ad valorem tax on certain bales of hemp imported from the Philippine Islands. An issue in the Supreme Court was whether the Ohio Supreme Court had erred in holding that petitioner was not the importer because it acquired title to the imported goods after their arrival in this country. The goods were shipped to the United States on consignment to a broker, and title was secured in a bill of lading delivered to the broker or a bank. In reversing the Ohio Supreme Court, the Supreme Court stated:

* * * Petitioner's contracts of purchase are the inducing and efficient cause of bringing the merchandise into the country, which is importation. Examination of the documents and consideration of the course of business can leave no doubt that the petitioner not only causes the importation but that the purpose and necessary consequence of it are to supply petitioner with the raw material for its manufacture of cordage at its factory in Ohio. [at p. 661, 65 S.Ct. at p. 875]

Concerning the meaning of importation in the constitutional sense, the Supreme Court further stated:

For the purpose of determining whether petitioner was the importer in the constitutional sense, it is immaterial whether the title to the merchandise imported vested in him who caused it to be brought to this country at the time of shipment or only after its arrival here. * * * For in determining the meaning and application of the constitutional provision, we are concerned with matters of substance not of form. When the merchandise is brought from another country to this, the extent of its immunity from state taxation turns on the essential nature of the transaction, considered in the light of the constitutional purpose, and not on the formalities with which the importation is conducted or on the technical procedures by which it is effected. It is common knowledge to lawyers and businessmen that vast quantities of merchandise are annually imported into this country by purchasers resident here, for sale or manufacture here. Sometimes the buyer completes the purchase abroad, in person, and ships to this country; sometimes, as in this case, the purchase is on unsecured credit, but more often it is under contracts by which the vendor reserves in himself or his agent or a banker a lien or title as security for payment of the purchase price on or after arrival. To say that the purchaser is any the less an importer in the one case than in the others, is to ignore the constitutional purpose and substitute form for substance. [at pp. 662–664, 65 S.Ct. at p. 875]

■ The principle that tax statutes should be construed on the basis of the substance of transactions and events rather than methods of accomplishment has been applied in cases determining who is the "manufacturer" of an article subject to excise tax under a statute like

or similar to the one involved in this case. Thus, where one person manufactures or produces a taxable article for another who furnishes materials and retains title thereto, the latter for whom the article is manufactured or produced, not the actual manufacturer, is considered to be the "manufacturer" under the excise tax statute if the substance of the arrangements warrants such holding. Record Guild of America, Inc. v. United States, 172 F.Supp. 676, 679, 145 Ct.Cl. 686, 690 (1959). The patent holder, not the fabricator, was held to be the "manufacturer" and first seller of the fabricated article, even though there was an agreement between the fabricator, as seller, and the patent holder, as buyer, concerning the fabricated article. Polaroid Corp. v. United States, 235 F.2d 276, 278 (1st Cir. 1956), cert. denied 352 U.S. 953, 77 S.Ct. 325, 1 L.Ed.2d 244 (1956); Charles Peckat Mfg. Co. v. Jarecki, 196 F.2d 849, 851 (7th Cir. 1952), cert. denied 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678 (1952).

■ As is apparent in plaintiff's briefs, plaintiff's case is based on the form or method of accomplishment of the events and transactions involved in the importation of the pertinent Volkswagens, that is, the issuance and the processing of the technical, formal, and legalistic papers, such as the export invoices, banker's liens, letters of credit, and the like. The overall substance of the importation of the automobiles, however, is that all of the technicalities of the import procedures were as a matter of fact subordinate to and geared to the supply by plaintiff of all funds necessary to accomplish the importation. Deeren supplied none of such funds. For the risks and responsibilities assumed by Deeren, its $5 income per automobile was plainly adequate. Deeren's only basic act was to place orders for plaintiff with Luer. Of course, each order started in motion the necessary technical procedures, but importation of the automobiles ordered for plaintiff would not have been accomplished except for the credit arrangements which resulted in the direct payment by plaintiff through its bank of all costs incident to the purchase and importation of the pertinent automobiles.

It is concluded that plaintiff was the inducing and efficient cause of the importation of the pertinent Volkswagens, that plaintiff was actually the first purchaser of such imported automobiles, and therefore the importer of the Volkswagens within the meaning of the pertinent excise statute. Plaintiff's petition should be dismissed.