**SONY CORPORATION OF AMERICA**

**v.**

**The UNITED STATES.**

**No. 278–66.**

United States Court of Claims.

July 15, 1970.

Martin M. Lore, New York City, attorney of record, for plaintiff.

David J. Gullen, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This excise tax refund suit was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the Order of Reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an Opinion and Report filed October 9, 1969. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by defendant. Plaintiff filed no exceptions and urged that the commissioner's report be adopted. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The court agrees with the commissioner's opinion with minor deletions, his findings of fact with additions, and his recommended conclusion of law. Accordingly, the court adopts the same as modified as the basis for its judgment in this case. Plaintiff is entitled to recover and judgment is entered for plaintiff, with the amount of recovery to be determined in further proceedings pursuant to Rule 131(c). Defendant is not entitled to recover on its counterclaim, which is hereby dismissed.

### OPINION OF COMMISSIONER

SPECTOR, Commissioner:

This action hinges upon whether plaintiff-taxpayer, or another firm, was the "importer" within the contemplation of Section 4141 of the Internal Revenue Code of 1954,[1] a section which imposed a tax of 10 percent on the sale of various items by a "manufacturer, producer, or importer." Plaintiff, Sony Corporation of America (hereinafter "Sony of America"), was assessed $155,597.73, plus interest of $27,456.07, for the period January 1, 1960 through December 31, 1963. It paid $5,389.94 of this amount, and in this action seeks a refund with interest thereon. In its answer the Government

1. Repealed effective June 22, 1965, by § 204 of the Excise Tax Reduction Act of 1965.

raises a timely counterclaim for the balance of the tax assessed plus interest, in the total amount of $177,663.86, plus statutory interest.

Very briefly stated, plaintiff claims that Agrod Corporation or its successor in interest, Agrod Electronics, Inc. (both hereinafter sometimes referred to as "Agrod"), was the importer, and has admittedly paid the required tax, based on its price to plaintiff. During roughly the latter half of a 5 year arrangement hereinafter described, Agrod received various products of the type described in section 4141 from plaintiff's parent, hereinafter referred to as "Sony Tokyo." During the period in question, these products were transferred by Agrod to plaintiff. The Government, on the other hand, asserts that the tax should be predicated upon plaintiff's price to its customers, which results in a larger tax base. The tax at issue is therefore 10 percent of the difference between Agrod's price to plaintiff and plaintiff's price to its customers.

Prior to 1957, Tokyo Tsuchin Kogyo, Ltd., a Japanese corporation and predecessor of Sony Tokyo, had never sold transistor radios in the United States. In that year, Mr. Akio Morita, an officer of Sony Tokyo, was introduced to a Mr. Adolph Gross, a United States citizen, who had been well known for many years in the radio and electronics business. Mr. Gross made his living largely through his national contacts and through his wide knowledge of the radio and electronics business. Basically his reputation was that of an entrepreneur and an innovator who had the ability to get a new product successfully placed and established in the American market. Mr. Gross was also noted for his ability to raise the necessary capital for almost any undertaking. As a result of his reputation and ability, many foreign and domestic manufacturers sought him out to represent them in the American market.

On September 20, 1957, Mr. Gross and Sony Tokyo entered into an exclusive sales agency agreement. The agreement applied to radios, transistor tape recorders, transistor record players, and transistor dictating machines manufactured by Sony Tokyo. Geographically it applied to mainland United States, Alaska, Hawaii and Puerto Rico. As the exclusive agent under this agreement, Mr. Gross was to receive a commission of 6 percent of the net selling price, f. o. b. Tokyo. The amount of commission in fact paid was at all times 3 percent. The Sales Agency Agreement in addition provided, *inter alia*:

2. EXCLUSIVE REPRESENTATION

A. The Sales Agent's representation of the Company is on an exclusive basis. All inquiries on the products as outlined in paragraph 1/B (hereinafter referred to as the "Products") from the territory herein specified in paragraph 1/A (hereinafter referred to as the "Territory") will be referred to the Sales Agent, or exclusive importer as designated by the Sales Agent. The Sales Agent will be credited with all commercial sales made in the Territory of the Products, whether such sales are through the sole efforts of the Sales Agent or otherwise.

No sales of the Products are to be made in the Territory without definite consent and approval of the Sales Agent, and no quotations of the Products whatsoever made without the consent and approval of the Sales Agent. This may be supplemented from time to time by mutual written consent of the Company and the Sales Agent.

B. It shall be the duty of the Sales Agent, and the Company expects the Sales Agent, as its exclusive representative in the Territory, to actively and aggressively push the sales of the Products. The Sales Agent agrees not to sell or handle any competitive merchandise without the approval of the Company.

C. The Company agrees to notify the Sales Agent of any and all new items of the Products they are manu-

facturing, or intend to manufacture, so that the Sales Agent may have first choice of representation of said items.

Also on September 20, 1957, Sony Tokyo, Mr. Gross, and Agrod Corporation, which was wholly owned by Mr. Gross, entered into an exclusive distributorship agreement. The coverage of this agreement differed somewhat from that of the sales agreement. Agrod was thereunder granted exclusive distributorship rights to Sony radios. However, as to transistor tape recorders, transistor record players, and transistor dictating machines, Agrod was given first distribution rights. It had 60 days from the receipt of samples to elect to be the distributor. If it did not so elect, Agrod as sales agent was "completely free to approach other markets and prospective customers." The distributorship agreement did not extend beyond mainland United States. Both agreements contained automatic renewal provisions based upon specified volumes of sales, and both agreements contained a provision that at the end of 5 years new agreements would be negotiated.

At first, Agrod contemplated undertaking the distribution of Sony's products itself. However, in order to achieve the speediest possible distribution with a view to establishing Sony as the leader in consumer transistor products in America, Agrod sought out a subdistributor. It arranged with Gross Distributors (wholly unrelated to Mr. Adolph L. Gross) to take over the distributorship agreement. While the first shipment of transistor radios totaling 8,500 units was in transit, however, Gross Distributors withdrew.

Thereupon, on September 25, 1957, Agrod entered into an agreement with Delmonico International Corporation (hereinafter referred to as "Delmonico") assigning to it "all rights, title and interest vested" in Agrod under the distributorship agreement. Delmonico was not then aware that Mr. Gross had retained certain rights and privileges under the exclusive sales agency agreement.

At the beginning of this arrangement, there were misgivings as to whether Delmonico would live up to its subdistributorship agreement. Consequently, Agrod wrote on October 25, 1957, and gave Delmonico 10 days to decide what it intended to do. This same letter required that Delmonico take over the first shipment which, as previously mentioned, was in transit when the subdistributorship agreement was made. Delmonico elected to proceed under the agreement.

Mr. Adolph L. Gross died in April 1958. On July 1, 1958, the executors of Gross' estate, Agrod Corporation, and Agrod Electronics, Inc., entered into an agreement under the terms of which Agrod Electronics, Inc., acquired all the right, title and interest in the exclusive sales agency, distributor, and subdistributor agreements, in return for agreeing to make payments to Agrod Corporation based on the number of units imported for the remaining life of those contracts.

Agrod had not been satisfied with Delmonico's attitude from the beginning, and knew that sometime in the future a change would have to be made. It believed that Delmonico was not sufficiently promotion-minded, and did not have a full comprehension of the place that Sony Tokyo's products had and would have in the American market.

Matters came to a head in 1960. In February, Sony Tokyo instituted suit in the Supreme Court of New York to enjoin Delmonico from allegedly advertising that it had exclusive distribution rights to transistor television sets; and *from soliciting orders, and making other representations as to the size, weight, price and number of such sets which would be available, and the time of their availability.* Although Sony Tokyo had been marketing transistor television sets in Japan since the latter part of 1959, it had no intention of selling them for consumption outside of Japan until they had been thoroughly market-tested in Japan and adapted for use outside of

that country. Delmonico had acted even though Agrod had strongly and repeatedly urged it to refrain from any advertisement or announcement with respect to the transistor television sets. All such advertisements and announcements made by Delmonico were untrue, and were believed by Sony Tokyo to be damaging to its reputation among retailers and the public.

The parties settled their dispute out of court. Delmonico no longer wished to continue as the subdistributor of radios and other Sony products if it could not also distribute the transistor television sets. On or about February 19, 1960, plaintiff herein, Sony of America, purchased Delmonico's inventory of Sony products and Delmonico's subdistribution rights for approximately $1,000,000. Of this amount, $75,000 was for the subdistribution rights, and the balance for the inventory.

On March 3, 1960, Sony Tokyo and Agrod Electronics, Inc., entered into an agreement reaffirming and modifying the original sales agency and distributor agreements above described. The modification of the sales agreement eliminated the requirement that the sales agent approve any sale of products under that agreement, or quotation of such products. The provision that Sony Tokyo would notify the sales agent of any new products, to give it the first opportunity for representation of those products, was also eliminated.

The distributor agreement was modified so that Agrod was made the exclusive distributor for monaural transistor tape recorders for home use, transistor record players, and transistor dictating machines. These were products that had previously been listed as those subject to the distributor's first refusal, the sales agent having had the right after 60 days to approach other markets and prospective customers.

Both the sales agreement and the distributor agreement were amended to expire on September 20, 1962, and there was no provision for renewal. These agreements did in fact expire on that date and were not renewed.

The manner in which a typical transaction occurred changed in only one respect when Agrod replaced Delmonico with Sony of America as subdistributor. The only alteration was that the 3 percent commission paid pursuant to the sales agent agreement was paid by Sony of America rather than by Sony Tokyo. This change was made because Internal Revenue agents had asserted that the commission actually represented a part of the purchase price of Sony products subject to excise tax, and also because there was no longer any need for secrecy with regard to the commission after Delmonico was no longer involved.

During the entire 5 year period of the agreements between Agrod and Sony Tokyo, the following procedures were typical. The initiation of orders was made by the subdistributor, first Delmonico, then later Sony of America. The subdistributor would solicit orders from various customers throughout the United States and submit a purchase order to Agrod whenever the subdistributor's existing inventory was insufficient to meet its outstanding or anticipated orders. Agrod would then place a corresponding order with Sony Tokyo.

The subdistributor would open an assignable letter of credit with its bank in the amount of the f. o. b. Yokohama price of the order, and send the letter of credit with its purchase order to Agrod. The letter of credit designated Agrod as the account party, and all of the documents required under its terms were made in Agrod's favor.

Agrod, using the same bank as the subdistributor, would immediately assign the letter of credit in favor of Sony Tokyo. Such an assignment prior to shipping reflected a policy of the Japanese Government which prohibited its manufacturers from selling internationally on open credit.

Sony Tokyo would deliver the order to a carrier designated by Agrod, and obtain and prepare the necessary docu-

ments in Agrod's favor. On some occasions Sony Tokyo secured insurance on shipments and named itself as the insured party. On others, when the goods were purchased C & I (cost plus insurance), it insured Agrod against loss. Sony Tokyo would also provide Agrod with the necessary shipping advice.

Sony Tokyo would deliver the documents to its bank in Tokyo, which would then send them by air to the bank used by Agrod and the subdistributor. Agrod would execute a bill of exchange in favor of the bank in the amount of the f. o. b. Yokohama price of the order, in return for which the bank would deliver the documents to it.

Upon the receipt of the shipping advice and the documents (which would be received shortly after the shipping advice), Agrod would arrange to have the order, or a part thereof, delivered either (1) directly to the subdistributor (at the location designated by the subdistributor); (2) to a subdistributor of the subdistributor; or (3) to a custom bonded warehouse. When the imported goods were put in a custom bonded warehouse, they would be put under Agrod's name. Agrod would thereafter withdraw the goods from the warehouse.

Agrod would deliver the documents to a freight forwarder (customs house broker) and make a payment to it which covered freight, customs duty, insurance, customs bonds, and forwarder's charges.

After the merchandise was delivered to the subdistributor, Agrod would submit its invoice. Included in the amount billed to the subdistributor were the f. o. b. value of the goods (the letter of credit opened by the subdistributor already covered this amount), customs duty and bond charges, insurance and freight charges, customs house broker's fee, 57½ or 75 cents per unit, and the excise tax. The invoice would be paid by the subdistributor by a trade acceptance in the f. o. b. amount of the order, payable prior to the due date of the bill of exchange signed by Agrod. The balance of the invoice would be paid by check.

As noted above, after Sony of America became the subdistributor, the 3 percent commission charge was also included in this bill.

Sony Tokyo had to rely on Mr. Gross' and Agrod's extensive knowledge of the American market because they were its only liaison in this country. Agrod was in nightly communication with Tokyo, placing orders, receiving information related to shipments, issuing directions to Sony Tokyo as to which vessels to use, keeping Sony Tokyo posted on market conditions in the United States, and on any press releases that Agrod was contemplating.

These press releases were part of Agrod's activities to promote the sale of Sony products in America. Agrod selected the national advertising agency and approved all advertising. The advertising was carried in the name of the subdistributor (Delmonico and later Sony of America), and was paid for either by the subdistributor or by Sony Tokyo. Product warranties were also carried in the name of the subdistributor. On occasion Agrod Electronics, Inc., would also sponsor a press reception to introduce a new product and to increase its public acceptance.

Agrod's support of Sony products went further than merely stirring up interest in established items. It was Agrod's initiative and primary responsibility that led to the introduction of two Sony products in the United States, namely, the AM/FM transistorized portable radio and the transistorized table model radio.

During the period in issue, the staff of Agrod Electronics, Inc., consisted of two clerical employees and four individuals with extensive knowledge and respected reputations in the radio and electronics field. While Agrod, Sony Tokyo, and Delmonico had no common directors, officers or shareholders, a minor overlap developed when Sony of America entered the picture. The original 101 shares of Sony of America were owned 100 shares by Sony Tokyo and

one share by Mr. Irving Sagor, President of Agrod Electronics, Inc. Upon the formation of Sony of America in February 1960, Mr. Sagor became Vice-President and Director of Sony of America. He resigned as an officer of Sony of America on September 27, 1960, and then Mr. Milton Thalberg, a Vice-President of Agrod became a Vice-President of Sony of America. Mr. Sagor did not receive any compensation as an officer or director of Sony of America during the period involved. Mr. Thalberg received compensation in the amount of $15,000 per annum as an employee of Sony of America. After the expiration of the contract between Agrod, Sony Tokyo and Sony of America, Mr. Thalberg's employment was continued. Mr. Sagor did not rejoin Sony of America as an employee until October 1964.

From February 8, 1960 until September 20, 1962, Mr. Akio Morita, an officer of Sony Tokyo, was the President of Sony of America. During that time he was present in the United States approximately 2 months each year. He received his compensation from Sony Tokyo rather than from Sony of America.

A comparison of the financial statement of Agrod Electronics, Inc., and Sony of America for the years in issue, illustrates the following:

|  | Agrod Electronics, Inc. | Sony of America |
|---|---|---|
| Value of fixed assets (at cost) | $ 5,000 | $ 161,593 |
| Current assets | 112,000 | 5,464,600 |
| Gross receipts | 4,500,000 | 9,101,000 |
| Business deductions | 137,027 | 2,095,000 |
| Capital stock | 1,500 | 505,000 |

The balance sheet filed with Agrod Electronics', Inc., tax return for the year ending April 30, 1961, indicates an opening inventory of $21,049.98 and no closing inventory. The balance sheet filed with its tax return for the year ending April 30, 1963, indicates that there was no opening or closing inventory. Sony of America's inventory for the years in issue averaged $2,498,000. Its current assets consisted primarily of cash and marketable securities.

Agrod's principal source of business income during these years was derived from its relationship with Sony of America, and that gross income totaled $660,027.00.

During the period when Delmonico was the subdistributor, Agrod paid the excise tax assessed under section 4141, based on its selling price to Delmonico. Agrod's tax returns for the years 1958 and 1959, years during which Delmonico was the exclusive subdistributor, were audited by the Government. In the course of that audit, the question was raised as to whether Agrod or Delmonico was the actual importer for excise tax purposes, and the conclusion was reached that Agrod was the importer. In fact, in the present proceeding against Sony of America, the Government has assessed no deficiency in excise tax on the inventory that Sony of America bought from Delmonico, as earlier described. Agrod continued to pay the excise tax assessed under section 4141, based on its selling price to plaintiff, Sony of America, after the latter was substituted for Delmonico. The Government has credited plaintiff with the tax paid by Agrod on the sales to plaintiff.

■ Because the incidence of an excise tax of the type here involved falls

upon the first sale of the product in the United States,[2] it is incumbent upon this court to determine when that first sale occurred. In confronting that issue, both parties proceed from the same premise. They urge that it is the substance of the transaction, not its form, which is the controlling factor. Adopting this approach, we conclude that plaintiff is entitled to recover on the basis of the facts presented.

Defendant first argues that Agrod completely sold its right to import Sony Tokyo's products to Sony of America, thereby making the latter the importer. This argument stems from the assignment of Agrod's distributorship agreement first to Delmonico, and later to Sony of America. But the argument is deficient in that it proceeds from an erroneous characterization of the situation. The assignment, in fact, was *not* complete. The record clearly illustrates that Agrod retained the initiative for introducing Sony products into the United States, even after the assignment of the distributorship contract. While the defendant is free to disregard form when it contravenes substance,[3] it may not do so where substance does in fact exist. The pattern of contractual relationships, more fully described above, underpin a finding of substance in the relationship between Agrod and Sony Tokyo. The original dealings by Sony Tokyo were with Mr. Adolph Gross. He was made the exclusive sales agent, and his controlled corporation, Agrod, was given the distributorship originally assigned to Delmonico. During the years in question, Agrod Electronics, Inc., the successor in interest to Agrod Corporation, had become the sales agent and Sony of America had been assigned the distributorship.

Mr. Gross and Agrod at all times unquestionably performed the initial function of importers. They were highly instrumental in bringing Sony products to America. By way of further example, Agrod would have borne the risk for the original shipment of radios had Delmonico not replaced the original subdistributor who withdrew while the goods were in transit. Agrod's continuous actions of promotion, though also consistent with the actions of a sales agent, were in keeping with those of an importer who wishes to broaden the market, and thereby increase demand for his imports. Finally, there is the evidence of the close contact between Agrod and Sony Tokyo, and the actual mechanics of sale, earlier described in detail. Agrod was Sony Tokyo's only liaison within the United States and the two were in nightly contact.

It should also be observed that Agrod was a part of the chain of title. The relevance of title has been disparaged by the parties, citing this court's opinion in Handley Motor Co. v. United States, 338 F.2d 361, 364, 168 Ct.Cl. 92, 98 (1964) to the effect that: "A determination of who is the 'importer' does not *in the first instance* turn on the law of sales." [Emphasis supplied.] However, the court's use of the phrase "in the first instance" is not without meaning since the opinion continues as follows:

> * * * The issue of "transfer" and "title passage" under the law of sales may be pertinent when it is necessary to establish which of two resident persons or corporations is the "importer" * * *.

The Government does not contest plaintiff's statement that title passed to Agrod upon shipment, and that title and risk of loss did not pass to Sony of America until delivery. It simply urges that those circumstances are irrelevant.

Moreover, the Government's basic premise or contention is not supported. As previously pointed out, Agrod did initiate the introduction of Sony products into the United States. Agrod's promotional activities should not be viewed in isolation. By helping to create more de-

2. Indian Motorcycle Co. v. United States, 283 U.S. 570, 51 S.Ct. 601, 75 L.Ed. 1277 (1931).

3. Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

mand from the public, that demand was transmitted to Sony of America which, in turn, would place larger orders with Agrod. There is support for plaintiff's argument which would not characterize Agrod as either agent for Sony of America or for Sony Tokyo but as a company simply trying to better its own economic position.

The facts of this case are clearly distinguishable from those present in the cases and rulings cited by the Government in support of its position. Agrod's role was far more important throughout the entire importation process than was the role of the parties in the cases cited. Their activities, in contrast, were so slight and their fees so small as to raise the question of their economic necessity.

In *Handley, supra,* for example, the court held that the plaintiff, an established retail car dealer, was the importer, stating:

> * * * A determination of who is the "importer" does not in the first instance turn on the law of sales. We think the "importer" is the first purchaser resident in the United States who arranges (as principal and not as an agent) for the goods to be brought into the United States * * *.

Plaintiff in that case had argued that Amerifact Corporation of New York City was the proper taxpayer. Plaintiff had responded to Amerifact's advertisement in a trade publication that it would ship Volkswagens directly from Germany. In upholding the trial commissioner's determination that plaintiff should bear the burden of the tax, the court marshalled these facts regarding Handley's activities, which closely parallel those of Agrod in this case:

> * * * [The financing agent's] letter of December 1, 1958, made specific reference to a purchase commission and required that commercial invoices be issued by a German automobile dealer in the name of plaintiff. Plaintiff paid all the freight charges and customs duties; the shipping and transfer documents listed plaintiff and

not Amerifact as the purchaser or consignee; Amerifact was not an established automobile dealer. Plaintiff received the automobiles directly from the European seller and made all the arrangements required for their receipt and delivery to its place of business. The evidence does not establish that Amerifact was to enter into the chain of title. Plaintiff may be viewed either as the first purchaser resident in the United States, or as the person or corporation primarily responsible for the entry of the automobiles into the United States as a matter of fact. [388 F.2d at 364, 168 Ct.Cl. at 99; footnote omitted]

Another case cited by the Government is Import Wholesalers Corp. v. United States, 368 F.2d 577, 177 Ct.Cl. 493 (1966). There the court also held that the plaintiff, a Volkswagen dealer, was the actual "importer," rather than Deeren Trading Corporation as contended by plaintiff. Plaintiff, in that case, argued that *Handley* was distinguishable because Deeren entered the chain of title, being named in the import documents as the importer, consignee or recipient, whereas plaintiff was not mentioned therein. In addition, plaintiff relied upon a sales agreement between itself and Deeren whereas none had existed between Amerifact and Handley. However, Deeren had been incorporated with virtually no assets, and was receiving a fee of only $5 per automobile. It generated none of the funds necessary for the importation and its only basic function was to place orders for plaintiff with a German contact. Its functions did not compare in importance with those of Agrod in the instant case.

In the last analysis, the Government's case stems from a suspicion that Agrod could not be the importer, because it was a company employing only six persons (two of them clerical), with a small or nonexistent inventory and relatively small assets. However, this suspicion is more than adequately answered by the findings and remains a mere suspicion. Four of the six employees were highly

knowledgeable in this business. One of these men, Mr. Adolph Gross, had encouraged Sony Tokyo to enter this new market. An inventory was not essential since Sony of America was obligated to buy from Agrod, and Agrod could therefore order for direct shipment to its subdistributor. The amounts earned by Agrod from its dealings with Sony Tokyo far exceeded the total tax at issue in this case, indicating that the transactions were not motivated by tax savings.

All of the contracts involved demonstrate arm's length bargaining. There can be no question that the contracts between Mr. Gross and Sony Tokyo were at arm's length and based on sound business considerations, as were those between Mr. Gross, Agrod and Delmonico. The fact that these contracts were basically continued throughout with different parties is very persuasive, as is the fact that the Government apparently accepted Agrod as the importer when Delmonico was the designated subdistributor.

The foregoing considered, it is concluded that plaintiff is entitled to recover on its claim, that defendant is not entitled to recover on its counterclaim, and that judgment should be entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c)(2).